JEFFREY L. CLEMENS
5210 W. Waterberry Drive
Huron, OH  44839
TEL: 419-433-4438
Shorehaven222@gmail.com

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JEFFREY L. CLEMENS, | ) | Case No. |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN C. PFAFF, PATRICIA | ) | |
| VINCHESI, JERRY LAVERONI, LEE | ) | |
| PHILLIPS, and RALPH SOZIO, | ) | |
| | ) | |
| Defendants. | ) | Malicious Prosecution |
| | ) | |

FILED
IN CLERKS OFFICE
2020 OCT -5  PM 12: 13
U.S. DISTRICT COURT
DISTRICT OF MASS.

## Parties

1)  Plaintiff Jeffrey L. Clemens is a freelance writer and
    activist.  He is a citizen of the United States and
    the State of Ohio.  His address is: 5210 W. Waterberry
    Drive, Huron, Ohio 44839.

2)  Defendant Stephen C. Pfaff is a Boston-area attorney
    and longtime counsel to the Town of Scituate, MA. He
    is a citizen of the United States and the Commonwealth
    of Massachusetts.  His address is: 57 Whittier Road,
    Wellesley, MA 02481.

1

3)   Defendant Patricia Vinchesi is a former Administrator
     for the Town of Scituate, MA.  She is a citizen of the
     United States and the Commonwealth of Massachusetts.
     Her address is:  56 Heywood Avenue, Melrose, MA 02176.

4)   Defendant Jerry Laveroni is a retired New York City
     police officer and former Director of Team Security
     for the New York Yankees.  He is a citizen of the
     United States and the Commonwealth of Massachusetts.
     His address is:  52 Old Oaken Bucket Road, Scituate,
     MA 02066.

5)   Defendant Lee Phillips is an attorney in Los Angeles.
     He is a citizen of the United States and the State of
     California.  His address is:  150 Pomar Lane, Santa
     Barbara, CA 93108;

6)   Defendant Ralph Sozio is a former U.S. Secret Service
     Special Agent and is now currently U.S. Marshal for
     the Southern District of New York.  He is a citizen
     of the United States and the State of New York.  His
     address is:  U.S. Courthouse, 500 Pearl Street, New
     York, NY 10007.

## Venue and Jurisdiction

This is an action arising under Massachusetts Law. The citizenship of parties is diverse. The United States District Court/Boston therefore has jurisdiction pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1332.

## Summary

This action brings a claim of malicious prosecution arising from federal charges initiated by the defendants in March 2010 during civil litigation involving the Town of Scituate, MA and its police department. These charges resulted in trial convictions and a 60-month sentence imposed upon the plaintiff. However, on October 6, 2017, the subject trial verdict was set aside.

The allegations herein establish that the defendants, in promoting plaintiff's prosecution, acted for a purpose other than justice - for benefit of persons in California - and, in doing so, caused significant harm to the plaintiff. Through his peculiar access to a U.S. attorney with deep undisclosed conflicts of interest, Defendant Pfaff sought multiple times to initiate prosecutions against plaintiff through an intermingling of numerous state and federal actors, all of whose actions, in their entirety, speaking to a purpose and intent far removed from justice.

3

## **Allegations**

1) That on or about October 30, 2009, the plaintiff
   filed a lawsuit in federal court against, among
   others, Defendant Pfaff and the Town of Scituate,
   MA, with whom Defendant Vinchesi was employed as
   Town Administrator;

2) That the lawsuit brought a claim of malicious
   prosecution for a [state] charge of Unlicensed
   Private Investigator [UPI];

3) That the UPI charge was initiated by the Town
   of Scituate Police on or about May 17, 2005 and
   based solely upon an allegation that the plaintiff,
   on May 12, 2005, said to Scituate resident Shelly
   Laveroni that he was a private investigator;

4) That Shelly Laveroni has never sworn under oath to
   such allegation [understandable since the plaintiff
   indeed never said he was a private investigator] nor
   has the plaintiff ever been given opportunity either
   in civil or criminal process to cross-exam her, owing
   mainly to acts and omissions of Defendant Pfaff who
   has effectively represented her in ongoing litigation
   with the plaintiff since 2007;

4

5)     That as of October 30, 2009, the Scituate Police
       and the Commonwealth of Massachusetts had yet to
       secure a lawful trial conviction for the UPI charge;

6)     That the UPI charge was initiated *after* a May 16,
       2005 contact to the Scituate Police by U.S. Secret
       Service Special Agent Ralph Sozio, of New York, a
       former colleague of Jerry Laveroni, father to Shelly.

7)     That Ralph Sozio sought and received, by facsimile
       transmission and for an unstated purpose, a copy of a
       Scituate Police Report dated May 13, 2005 related to
       an inquiry made to Shelly by the plaintiff, at a house
       owned by Jerry Laveroni, after which plaintiff was
       arrested [These events are well-documented in prior
       related litigation];

8)     That in subsequent Freedom of Information Act [FOIA]
       requests, starting in 2013, no reports by the Scituate
       Police were divulged to the plaintiff, particularly
       that which was faxed to Sozio in May 2005, nor any
       report by Sozio himself related to any law enforcement
       issue, and are presumed as not existing on the record
       with the U.S. Secret Service, strongly suggesting that
       Sozio acted as a private individual, not an agent;

9)    That a trial for the UPI charge was scheduled for
      November 23, 2008 but was cancelled due to a supposed
      scheduling conflict with an unrelated civil trial
      [although it is well established that criminal trials
      take precedent over civil trials];

10)   That plaintiff's UPI trial was effectively cancelled
      by the non-appearance of chief Commonwealth witness
      Shelly Laveroni who, at the time, was represented by
      Defendant Pfaff in related litigation involving the
      plaintiff [*See* Notice of Related Cases concurrently
      filed with this complaint, Case No. 07-cv-10845-RGS];

11)   That on or about July 25, 2009, the plaintiff wrote
      a letter to Shelly Laveroni asking her to confirm,
      with evidence, her "being out of the country" on the
      day of the November 23, 2008 scheduled UPI trial and
      subsequent months as alleged to the Hingham District
      Court by ADA Richard Linehan who prosecuted the UPI;

12)   That Shelly did not respond nor provide any evidence
      or information with respect to plaintiff's request;

13)   That on or about July 28, 2009, however, Defendant
      Jerry Laveroni, Shelly's father, called the plaintiff
      for an unstated reason;

14) That the plaintiff, at the time of Laveroni's call,
was indisposed and suggested talking at another time,
after which Defendant Laveroni voluntarily provided
three [3] separate phone numbers for the plaintiff
to reach him [Laveroni], a *home* phone, a *cell* phone
and a *work* phone;

15) That several days later the plaintiff called Laveroni
using his cell number and indeed reached him when,
as he self-described, he was "on the field", presumed
to be the field at Yankee Stadium, and so, asked that
he [plaintiff] call him on his office phone after some
minutes, presumably so he could get to his office;

16) That plaintiff indeed called Jerry Laveroni at his
office phone some minutes later, but Laveroni did not
answer and, instead, a recording machine or some other
voicemail-type device was activated;

17) That the plaintiff, in a message left on said machine,
asked Defendant Laveroni to call him back;

18) That Defendant Laveroni never called plaintiff back;

19) That on or about August 30, 2009, the plaintiff wrote
a letter to Defendant Pfaff and informed him of Jerry

19)    (continued) Laveroni's then recent contact [His call,
       with he being a client to Pfaff in then prior related
       litigation involving the plaintiff, was arguably out
       of place and inappropriate] and furthermore insisted
       upon receiving documentary evidence, such as copies
       of passport entries, proving Shelly was "out of the
       country… in Italy", as was told to the Hingham [MA]
       District Court the previous December [2008] at a
       rescheduled hearing resulting from the trial mishap
       spoken to previously in this complaint;

20)    That Defendant Pfaff never responded to plaintiff's
       request, however, he [Pfaff] did, as learned later,
       indeed take action involving federal law enforcement
       agents, attempting to characterize plaintiff's letter
       as "threatening";

21)    That on or about September 2, 2009, unbeknownst to
       the plaintiff, Defendant Pfaff forwarded, by email
       [gotten through pretrial discovery in 2011], a copy
       of the plaintiff's August 30, 2009 letter to FBI
       Special Agent Eric Toole;

22)    That Pfaff included in his email to Toole a reference
       to Defendant Laveroni advising him [Pfaff] to contact

22)   (continued) U.S. Secret Service Special Agent Ralph
      Sozio as well as the *New York* U.S. Attorney's Office;

23)   That in April 2008, during earlier related litigation,
      Pfaff cancelled a scheduled deposition with Scituate
      Police Sergeant Mike O'Hara at the last minute and did
      so through filing of what he described as an emergency
      motion, one in which plaintiff was not able to oppose
      as he was on the road to Boston from Ohio to conduct
      the O'Hara deposition;

24)   That, in protest to Pfaff's last minute tactics, since
      discovery had been ongoing for months without any
      stated issue, the plaintiff left a series of voicemail
      messages with his [Pfaff's] office phone, after which
      Pfaff presented the messages to FBI Special Agent
      Toole, presumably doing so for consideration of some
      kind of "interstate threat" charge which, of course,
      never developed, for obvious reason as said messages
      contained no actionable threats but mere adversarial
      and blusterous language;

25)   That upon service of plaintiff's October 30, 2009
      lawsuit upon Defendant Vinchesi, on or about November
      8, 2009, the Town of Scituate defaulted, that is, it

25)  (continued) failed to answer the subject complaint
     within 20 days [by November 28, 2009] as was required
     by the Federal Rules of Civil Procedure;

26)  That on or about December 10, 2009, the plaintiff
     addressed a letter to Defendant Vinchesi, then Town
     Administrator, concerning the then recently filed
     lawsuit and the town's default, later following on
     with phone calls and other letters, all in an attempt
     to resolve the matters at hand, including especially
     the default for which the plaintiff filed, with the
     court, a requisite Notice of Default and likewise a
     Request For Entry of Default Judgment;

27)  That Defendant Vinchesi never in any way answered the
     plaintiff's communications (letters and phone calls)
     yet she, as learned later [pretrial discovery in 2011],
     took immediate action to contact Defendant Pfaff;

28)  That Defendant Pfaff, on or about December 22, 2009,
     contacted the plaintiff, by phone, asking plaintiff to
     set aside his then recently filed Notice of Default;

29)  That upon Defendant Pfaff's request for a set aside,
     plaintiff declined to oblige and, in turn, Pfaff gave
     notice that he intended to appear and answer for the

29) (continued) Town of Scituate and Shelly Laveroni [who, too, was served process at the same time at the town];

30) That immediately upon Pfaff notifying plaintiff of his intent to appear and answer for the two defendants, the plaintiff addressed a letter to Patricia Vinchesi informing her of the conflict with Pfaff representing co-defendants and police witnesses in the same suit, a situation disallowed by the Rules of Professional Conduct, furthermore sending it as an email attachment to Vinchesi in addition to regular mail;

31) That Defendant Vinchesi, as learned later [pretrial discovery in 2011], immediately forwarded plaintiff's email to Defendant Pfaff who then immediately emailed it to FBI Special Agent Toole, claiming some sort of a "threat" within the letter [none existed];

32) That FBI Special Agent Toole, in turn, as was later learned [pretrial discovery in 2011] immediately forwarded the plaintiff's email [to Vinchesi] to a certain Assistant U.S. Attorney Nadine Pellegrini;

33) That Pfaff, on December 23, 2009, at the will of the Town of Scituate's head administrator [Vinchesi], did indeed appear and answer for both Defendants Shelly

33)   (continued) Laveroni and the Town of Scituate, making
      blanket denials but failing to Show Cause for their
      defaults, what is otherwise, by well-established rule
      and precedent, required of defaulted parties;

34)   That following a February 10, 2010 court hearing
      [what was designated a Scheduling Conference], at
      which only Defendant Pfaff was present [a family
      matter precluded plaintiff's appearance], plaintiff
      gave notice to Pfaff of his intent to depose Shelly
      Laveroni on or about March 25, 2010;

35)   That on or about March 5, 2010, Defendant Pfaff filed
      a Rule 12 motion for dismissal as for himself despite
      he himself having not been served process and despite
      the fact that courts, as is widely known, do not have
      jurisdiction to hear motions from parties who have not
      yet been served process;

36)   That on or about March 8, 2010, upon receipt of a copy
      of Defendant Pfaff's Rule 12 motion, which came as a
      surprise since Rule 12 motions are not possible once
      parties have answered the complaint [the remedy, in
      that case, is a Rule 56 motion], the plaintiff emailed

36)   (continued) Pfaff informing him, among other things,
      his [the plaintiff's] intent to file an opposing brief;

37)   That Defendant Pfaff, the next day, on or about March
      9, 2010, forwarded plaintiff's email to the presiding
      judge in the then current lawsuit against Shelly and
      the Town of Scituate [Hon. William G. Young], with a
      short message "The *latest* missive from Clemens", doing
      so ex parte and without notice to the plaintiff who,
      of course, would have asked, "What *prior* missives were
      sent to Judge Young or otherwise described to him,
      say, at the February 10, 2010 hearing before him, one
      at which plaintiff was not present?" [The court later
      claimed, when asked to produce official transcripts,
      the hearing was not recorded];

38)   That Pfaff, about 30 minutes later, emailed Young
      again and informed him that he [Pfaff] had contacted
      FBI Special Agent Eric Toole and, again, not informing
      the plaintiff of his [Pfaff's] ex parte communication,
      a practice that is generally disallowed in the courts
      but for administrative reasons;

39)   That these Pfaff emails [to Young] were not divulged
      to the plaintiff until August 2010, five months later,

39)   (continued) meanwhile, the plaintiff's lawsuit against
      Pfaff, Shelly Laveroni and the Town of Scituate was
      thrown out, by Young, for a supposed yet unspecified
      and unrevealed "scurrilous communication";

40)   That likewise, on March 9, 2010, *after* emailing Young,
      Pfaff forwarded the plaintiff's March 8, 2010 email to
      FBI Special Agent Eric Toole who then "gleefully", as
      evidenced by his language, forwarded the email to U.S.
      Attorney Nadine Pellegrini who, less than five minutes
      later, as evidenced by time stamps, emailed Toole back
      and exclaimed, "We *now* have to charge this guy", this
      despite the email's extensive reference to all manners
      of police, prosecutorial and judicial misconduct, acts
      which call for prudence and thoughtful inquiry beyond
      a mere few minutes;

41)   That on or about March 11, 2010, Defendant Pfaff,
      despite supposedly having received a "threatening"
      email from the plaintiff, personally called plaintiff
      and read to him [the plaintiff] verbatim a court order
      from Judge Young directing plaintiff to Show Cause as
      to why his case should not be dismissed for some kind
      of supposed "scurrilous communications", otherwise not
      divulged;

42)   That on or about March 11, 2010, as learned later
      [pretrial discovery in 2011], FBI Special Agent Rachel
      Boiselle emailed Defendant Pfaff and *apologized* for
      not yet obtaining an arrest warrant for the plaintiff
      [It is worth noting that at the time (March 2010)
      Pfaff represented numerous FBI agents in civil appeals
      related to noted gangster Whitey Bolger and his 1995
      indictment, after which Bolger was tipped off by FBI
      handlers and went "on the run", actions which led to
      numerous gang-style killings and civil filings];

43)   That on or about March 16, 2010, Agent Boiselle swore
      out a warrant for the arrest of the plaintiff for, by
      his email to Pfaff, an alleged violation of federal
      law;

44)   That Agent Boiselle's warrant request referred to,
      among other things, a lawsuit filed by the plaintiff
      "on August 3, 2009" [sic], even though his lawsuit
      [for Malicious Prosecution on the UPI] was actually
      filed on October 30, 2009;

45)   That "August 3, 2009" was merely the date ascribed to
      the signature page on the subject complaint, not to a
      filing date, and was the only place such date appears,

45) (continued) thus indicating that Boiselle had read the
    complaint prior to seeking an arrest warrant, arguably
    seeking the warrant due to what the complaint alleged
    but which went unstated, suggesting ill-motive;

46) That such complaint, signed August 3, 2009 and filed
    October 30, 2009, was arguably damning to Defendants
    Pfaff, Laveroni and Sozio [The complaint is a matter
    of record and therefore not cited herein];

47) That on March 17, 2010, the plaintiff was arrested
    at his home in Huron, Ohio, on the Boisselle warrant,
    and released five days later on a 250K property bond
    and GPS ankle monitor;

48) That, according to testimony proffered in March 2019,
    Scituate Police Chief Michael Stewart, under oath,
    voluntarily stated that he was "friends" with FBI
    Special Agent Randy Jarvis;

49) That Randy Jarvis is a resident of Scituate, MA;

50) That Randy Jarvis is [or was in 2010] Agent Rachel
    Boiselle's *supervisor*;

51) That Brian Stewart, uncle to Mike Stewart, preceded
    Michael Stewart as Scituate's Chief of Police and was

51)   (continued) Chief of Police when the plaintiff was
      first charged with UPI in May 2005 and likely himself
      has relations to Randy Jarvis and was complicit with
      the bringing of the UPI charge;

52)   That despite having received, from Defendant Pfaff,
      three (3) prior communications from the plaintiff,
      otherwise deemed "threatening", Agent Toole did not
      swear out a warrant for the plaintiff's March 8, 2010
      email to Pfaff [Boiselle did], thus avoiding scrutiny;

53)   That despite having received, from Agent Toole, at
      least two if not more prior communications of the
      plaintiff otherwise deemed "threatening", AUSA Nadine
      Pellegrini did not prosecute the plaintiff [seek his
      indictment] but, rather, AUSA David Tobin, a former
      ADA at the Hingham District Court where the noted UPI
      prosecution [subject of the plaintiff's then current
      litigation] occurred;

54)   That, as such, AUSA Tobin is a former colleague of a
      certain ADA Richard Linehan who had conducted said UPI
      prosecution at the Hingham District Court and, in turn,
      had represented that Shelly Laveroni was "out of the
      country until late January [2009]", thus precluding a

54) (continued) UPI trial before then and any cross-examination of the Commonwealth's chief witness, Shelly Laveroni;

55) That on or about November 5, 2008, upon being asked by a Hingham District Court judge whether he and his witness [Shelly Laveroni] were ready for the November 23, 2008 trial, ADA Richard Linehan said, "Yes, Your Honor."

56) That ADA Linehan is a longtime colleague, at what is called the Babe Ruth Little League [Hingham], of a certain Daniel Morrison, insurance underwriter for the Town of Scituate who later [in 2009] was sued by the plaintiff as well, in addition to Pfaff and the Town of Scituate [both Linehan and Morrison were coaches, the former being the league's president as well];

57) That Dan Morrison's firm, Trident Insurance Services of New England, was indeed served process and in fact filed a timely [if not inappropriate] Rule 12 motion to dismiss, which was never subsequently ruled upon due to Judge Young dismissing the case for a supposed "scurrilous communication";

58) That AUSA David Tobin, on or about April 16, 2010, at
a grand jury proceeding, by and through the testimony
of Rachel Boiselle, represented to the jury that the
plaintiff, at the time of his arrest [March 17, 2010],
had said to the arresting officer [FBI Special Agent
Tom Greenawalt] that he [the plaintiff] "knew that his
email would be taken as threatening";

59) That FBI Special Agent Tom Greenawalt's official 302
Form Report of plaintiff's arrest does not cite such a
statement or anything resembling it, as would surely
have been reported if it was indeed said [it was not]
as such statement speaks directly to the standard
used at the time by the First Circuit to evaluate the
elements of the charge at hand [Email Threat];

60) That, as such, Tobin and Boiselle, at the grand jury
proceeding wherein they obtained an indictment, made
knowingly false statements;

61) That at the plaintiff's later trial, FBI Special Agent
Greenawalt did *not* testify, under examination by Tobin,
to the plaintiff as having said, upon his arrest, that
he "knew his email would be taken as threatening";

62)   That, again, Tobin is a former colleague of Linehan,
      conductor of the underlying UPI prosecution, and Chief
      Stewart is a friend of Randy Jarvis, supervisor to FBI
      Special Agent Boiselle whose warrant brought about
      the arrest of the plaintiff and whose testimony was
      used to obtain an indictment of the plaintiff;

63)   That pretrial, from March 2010 to May 2011, plaintiff
      fought vigorously for dismissal of Tobin's indictment,
      parts of the grand jury transcript record of which
      were withheld until the eve of trial [instructions to
      the jury immediately following the Boiselle testimony
      noted above] and, too, following conviction, the
      plaintiff sought trial verdict set aside on numerous
      bases clear up to his January 2012 sentencing;

64)   That the plaintiff's March 8, 2010 email contained not
      threats of harm but mere wishes and desires of which
      have long been deemed, by the U.S. Supreme Court, as
      being protected Free Speech, yet plaintiff received a
      60-month prison sentence, all of which was served;

65)   That, in fact, at the grand jury proceeding on or
      about April 14, 2010, AUSA Tobin, when asked by a
      juror whether curses are threats, answered, "That is

65) (continued) up to you to decide" when his answer should have been "No" as curses are "wishes and desires" and thus constitutionally protected Free Speech;

66) That AUSA Tobin's misrepresentation, to said juror, was meant to sway the jury in favor of indictment and indeed swayed the jury as such misrepresentation had the effect of giving judicial powers to a group of jurors who otherwise do not posses authority to make such a ruling [deeming a curse a threat] as they are but to decide probable cause and nothing else;

67) That on April 1, 2015, the plaintiff filed for habeas corpus relief on numerous bases [not cited as they are a matter of record];

68) That on October 6, 2017, the U.S. District Court, presided over by the Hon. Douglas Woodlock, set aside the May 11, 2011 subject trial verdict for which the plaintiff's March 8, 2010 email to Pfaff [and cc'd to Vinchesi] was subject;

69) That in the spring of 2018, the U.S. Attorney's Office announced its intent *not* to retry plaintiff;

70)   That following the U.S. Attorney's announcement noted
      above, Judge Woodlock issued a court order dismissing
      the case [the 2010 threat prosecution] in its entirety.

## Other Relevant Allegations

1)   That since the April 1, 2015 habeas filing, and March
     8, 2016 release of plaintiff from Supervised Release,
     besides the harm incurred as an incarcerated person,
     the plaintiff has endured numerous harmful actions on
     the part of Defendants Pfaff and Vinchesi;

2)   That in March 2016, one day following the plaintiff's
     release from the sentence imposed upon him by the May
     2011 trial, conducted by AUSA Tobin, Defendant Pfaff
     motioned for an injunction for a second time [his
     first motion in 2013 was over-turned in 2015] seeking
     to bar the plaintiff from filing lawsuits against
     anyone tied to his 2005 Scituate prosecution without
     first having leave of the court;

3)   That Judge Dennis Saylor, currently the chief judge of
     the U.S. District Court/Boston, in July 2016, granted
     the Pfaff motion, later appealed and upheld, as can be
     argued, *wrongly* upheld as Pfaff never "more narrowly

3)   (continued) tailored" his motion, as directed by the

appeals court, nor divulged, in his motion, that on

June 16, 2015, charges against the plaintiff at the

Hingham District Court were dismissed and, at that,

without having achieved any lasting conviction in over

ten [10] years [a valid claim on the very face] and,

too, the injunction being clearly too broad and far-

reaching, including even U.S. Marshals and many others

who were not even ever served process and could have

not ever possibly argued for an abuse by the plaintiff;

4)   That Pfaff, in his pleading that sought an injunction,

which he first brought amid a Rule 12 dismissal motion

in 2014 [which precludes introduction of any documents

but a select few governed strictly by rules of civil

procedure], introduced a *judgment* [by an arguably

coerced plea] from a Los Angeles case and an earlier

federal prosecution that commenced just days after

plaintiff's May 12, 2005 inquiry to Shelly Laveroni

[a warrant of arrest was sworn out on May 23, 2005 and

the plaintiff arrested on May 25, 2005 by FBI Special

Agent Tom Greenawalt, who was, at the time, arguably,

a colleague of FBI Special Agent Eric Toole [Toole is

married to Krista Shoaff, herself an FBI agent as well

4)    (continued) as her father, Stuart, and great uncle,
      Clark, all FBI agents and all having lived in Ohio
      near Cleveland where Eric Toole once lived and where
      arrestor Tom Greenawalt has long-called home];

5)    That the subject of the judgment involved a certain
      U.S. District Court judge by the name of Dickran
      Tevrizian, an alleged victim of a supposed threat by
      the plaintiff by and through a letter sent to him
      [Tevrizian] two (2) days after the plaintiff's arrest
      in Scituate [May 12, 2005], and admittedly sent
      *because* of said arrest, seeking explanations for his
      [Tevrizian's] conduct in earlier litigation by the
      plaintiff and involving a literary and talent agency
      [Creative Artists], litigation for which the plaintiff
      was inquiring when he visited Scituate, MA on May 12,
      2005 [This is well-documented in related litigation];

6)    That Dickran Tevrizian is a former associate of Manatt
      Phelps and Phillips, a Los Angeles entertainment law
      firm at which John F. Kennedy, Jr., as a law student
      at New York University, interned in the summer of 1988;

7)    That AUSA Nadine Pellegrini, as two independent online
      sources reveal, has familial ties to a winery on Long

7)    (continued) Island, New York's North Fork, called
      Pellegrini Vineyards, where at one time the second
      husband to Jacqueline Kennedy's step-brother [Hugh
      Auchincloss]'s first wife once acted as manager and
      vintner, a person [Larry Perrine] originally from
      Los Angeles and a vintner at Pellegrini at the time
      JFK, Jr. interned at Manatt;

8)    That the Long Island vineyard noted above is owned
      by a former partner to Michael Gross [deceased] who
      produced numerous movies "packaged" by Creative
      Artists and Michael Ovitz [e.g. Ghostbusters], both
      adversaries to the plaintiff in prior litigation which
      involved issues with Tevrizian, and movies of which
      were directed by Ivan Reitman, of Santa Barabara, a
      colleague of Lee Phillips, of Manatt, Phelps and
      Phillips, at the Santa Barbara International Film
      Festival [SBIFF] [both are longtime board directors];

9)    That the daughter-in-law to the vineyard owner noted
      above [Anais] maintains an office in a building
      occupied by the SBIFF and is, too, a colleague of Lee
      Phillips at numerous Santa Barbara, CA organizations
      of which his wife is involved, such as, for instance,
      "Girls Rock" on whose board all three reside;

10)   That, too, Anais is significantly involved with the
      Dream Foundation, as is Lee Phillips' wife and, too,
      Priscilla Presley, a former longtime board member of
      MGM, a co-defendant in plaintiff's Creative Artists
      litigation [previously referred to herein] and former
      associate of Robert Conrad, himself a former colleague
      of Defendant Jerry Laveroni and whose name, as is
      well-established in prior litigation, was referred to
      on May 12, 2005 when the plaintiff made his inquiry to
      the Laveroni residence and after which he [plaintiff]
      was arrested;

10)   That the plaintiff in recent days has sought comment
      from Lee Phillips on this matter involving AUSA Nadine
      Pellegrini and Anais, by email communication to his
      firm, but has not heard back from him as of the last
      and final revision of this complaint;

11)   That from September 2016 to July 2017 the plaintiff
      made numerous attempts to meet personally with Ralph
      Sozio at his then newly organized cigar shop called
      The Eagle's Nest, in Harrison, NY, to no avail, at one
      point leaving a business card with the plaintiff's
      email address affixed and expecting a response that
      never came;

12)   That on the night of the very day upon which a Sozio
      colleague was given the plaintiff's business card, a
      message was sent, by Gmail, to the plaintiff warning
      of an attempt by someone in *Los Angeles* to sign into
      his email;

13)   That both Nadine Pellegrini and Anais have ancestral
      ties to Malta and mainland Italy in the general area
      of Potenza and Matera;

14)   That Ralph Sozio, too, has ancestral ties to Italy,
      in Pratola Serra, not all too distant from Potenza, a
      coincidence that begs for an inquiry, especially given
      that Defendant Sozio has three uncles in said region;

15)   That AUSA Tom Weldon, of Toledo, Ohio, in May 2005,
      at the first hearing following the plaintiff's arrest
      by Tom Greenawalt [and to remind the reader, for a so-
      called "threat" charge involving Dickran Tevrizian,
      "victim" and former colleague of Los Angeles attorney
      Lee Phillips], reported to the court that he had been
      informed by the *Secret Service* of the open HDC charges;

16)   That Randy Levin is a longtime (and current) president
      of the New York Yankees as well as a longtime trustee
      on the board of George Washington University [GWU];

17)  That Charles Manatt, former longtime colleague of Lee
     Phillips, was, too, a longtime trustee on the board of
     GWU (from 1983 to 2008) and, as such, was a longtime
     colleague of Levine who, it is believed, ties to Sozio;

18)  That from March 2016 to May 2016, *following* Defendant
     Pfaff's filing of a motion for injunction against the
     plaintiff [obviously "okayed" by the Town of Scituate,
     his longtime client with respect to the plaintiff's
     litigation], Chief Mike Stewart and Defendant Vinchesi
     announced and orchestrated numerous Executive Sessions
     of the town's Board of Selectmen [BOS] for a stated
     purpose of "Clemens - Security";

19)  That it is believed these sessions were actually to
     discuss "Litigation", not security, as there was never
     at any time prior any issue to do with "security" and
     "Clemens" [the plaintiff as of that time had not set
     foot in any Scituate building or residence in nearly
     11 years and, even then (May 2005), he had only made a
     public records search with the assessors office and a
     simple albeit incomplete inquiry to Shelly], that is,
     there exists a security issue concerning "Clemens"
     nowhere but in the imagination of Chief Stewart and
     Vinchesi and, as well, there exists no statement by

28

19)   (continued) the plaintiff that speaks to any intended
      harm by him upon Vinchesi or any other town employee
      [as for how Tobin got an indictment and conviction for
      a threat to Vinchesi is baffling to this very day but
      then again, there no longer exists a conviction];

20)   That as a result of Pfaff's injunction motion, the
      plaintiff was required to travel to the Hingham
      District Court [HDC] to obtain records of his UPI case
      for exhibition and support and indeed, on or about
      April 12, 2016, plaintiff went to HDC with his brother,
      Jonathan, gathered some documents and, when they left
      the courthouse, they were followed and harassed by the
      Hingham Police, that is, they were pulled over by the
      side of the road and wrongly accused of not having a
      license [It was later learned that an unknown and
      since then unidentified courthouse employee called
      Sergeant O'Hara - 2005 arrestor of the plaintiff - and
      he, in turn, directed the Hingham Police to pull the
      plaintiff over; as for whether AUSA Tobin knows such
      "hidden agent", at the HDC, where he once worked, is a
      question left for another day];

21)   That following the Hingham pullover, the plaintiff and
      his brother went to the Scituate Police Department to

21)  (continued) complain but were directed to Chief Mike
     Stewart, who then served No Trespass Notices on each
     of them, with the stipulation that they were to "stay
     away" from Scituate Town Hall [where, coincidentally,
     public records are kept, especially all minutes of the
     BOS];

22)  That upon doing online inquiries as to meeting dates
     and times for BOS meetings [so that plaintiff might
     attend a meeting and protest the conduct of Stewart
     and Vinchesi], the plaintiff discovered that Executive
     Sessions of the BOS had been called and indeed took
     place in regards to plaintiff, March through May 2016;

23)  That in September 2016, the plaintiff indeed traveled
     to Scituate to attend a BOS meeting, thereupon seeking
     minutes beforehand at the Scituate Town Hall;

24)  That the plaintiff, upon making an otherwise legal
     public records request, was arrested and held over-
     night on the authority of Chief Stewart's No Trespass
     Notice, thus precluding attendance of the BOS meeting;

25)  That the plaintiff was prosecuted for Trespassing and
     in preparation of his defense made a phone inquiry to
     the Town of Scituate Records Office, in February 2017,

25)   (continued) after which he [plaintiff] was (falsely)
      charged with Intimidation of a Witness, unbeknownst to
      him [plaintiff] for over six [6] months;

26]   That after inquiring again to Ralph Sozio's cigar shop
      in Harrison, New York, and after making inquiries to
      the U.S. Attorney's Office, in Toledo [to discuss with
      AUSA Weldon the involvement of Sozio in his 2005
      federal prosecution], and after numerous conferences
      with FBI agents [S.A. Melissa Lewis of Syracuse, NY
      and others unnamed and unidentified], meet ups during
      which there was extensive discussion of Ralph Sozio,
      the plaintiff was arrested at gunpoint by seven armed
      police on August 17, 2017 at his home in Huron, Ohio,
      and despite his protests and filing a habeas corpus
      petition, he was extradited to Massachusetts and
      released only after posting a 30K cash bond and having
      a GPS monitor attached to his ankle, eventually being
      held for a total of 54 days, all for simply seeking
      the name of a Scituate town clerk encountered by the
      plaintiff and his brother in their visit to the town's
      records office in the preceding spring [April 2016];

27)   That the woman making the accusation, of intimidation,
      and who was not a witness at all to "trespassing", as

27)   (continued) the visit predated Stewart's No Trespass
      Notice, was Therese Tufts, whose son Brian, yes, is a
      police officer working with and beside Chief Stewart;

28)   The that plaintiff, after being dragged through twenty
      [20] months of pretrial GPS monitoring and such, was
      acquitted of the Intimidation of a Witness charge in
      April of 2019;

29)   That upon receiving copies of documents sent to the
      Governor of Ohio [John Kasich] by MAGO [Massachusetts
      Attorney General's Office], it was learned that an
      AHRO [Anti-Harassment Restraint Order] was issued by
      the Hingham District Court at the request of Defendant
      Vinchesi on November 1, 2016;

30)   That the service of the AHRO on the plaintiff was
      falsified by the Erie County [Ohio] Sheriff's Office
      [ESCO], an agency with whom former FBI Special Agent
      Tom Greenawalt now works;

31)   That the ESCO alleged service of the AHRO on November
      3, 2016 at about 10:00 a.m., however, the plaintiff
      was at the Huron [Ohio] Public Library since 9:00 that
      morning, verifiable by computer user records, going

31)   (continued) afterward to the post office, at 11:03, from which a printed and dated receipt was generated;

32)   That the ESCO cited a records number referring to an entirely unrelated auto accident event;

33)   That the brother to the deputy who supposedly served the plaintiff attended Ohio University at the same time [1992-1996] as Krista Shoaff, wife to FBI Eric Toole, facilitator of Pfaff communications to Nadine Pellegrini and a major "player" in the "build up" to the plaintiff's 2010 federal prosecution;

34)   That on the morning of November 3, 2016, since he had just returned from a long trip to the East Coast, the plaintiff, to give his own car a rest, had borrowed a family member's car and that, as such, it appeared that the plaintiff was home and therefore subject to service, only, he was not at home and the deputy, for some nefarious reason [not hard to guess why], took the opportunity to falsify service and actually keep notice of the AHRO from the plaintiff, with the not too unlikely hope that he "violates" the order and can then be arrested and charged per the will of Defendant Vinchesi and the Scituate Police;

35)  That the request for service of the AHRO did not come
     from the Hingham District Court [it had the day before
     attempted to serve the AHRO on an old former address,
     even though the court had indeed the current address
     of the plaintiff as the plaintiff had, then recently,
     filed numerous pleadings that clearly referred to a
     new and correct address] but, rather, the ESCO was
     directed by the *Scituate Police Department* to serve
     the AHRO, as is verifiable by documentary evidence;

36)  That the AHRO itself, sought by Defendant Vinchesi,
     cited three absolutely innocuous events; two separate
     letters to her seeking to mediate the plaintiff's
     claims and the September 2016 visit to the Scituate
     Town Hall merely to obtain a public record, which were
     all legal and proper acts inappropriately "spun" by
     Vinchesi to obtain an AHRO which, in turn, was not
     served on the plaintiff [he learned of it from jail
     in September 2017] so had no opportunity to object or
     oppose;

37)  That on or about July 25, 2009, Attorney Matt Cameron
     filed a Rule 32 motion for retrial in regards to the
     subject UPI charge, which was otherwise "CWOF'd" since
     December 2008;

38) That the Hingham District Court "ignored" the Cameron
motion clear until January 2012, until just before
the plaintiff's federal sentencing [in this lawsuit's
subject prosecution], making the peculiar move to fax
a request to the judge, who had since moved to another
district, to resolve an open parole violation issue
yet, instead, the judge ruled on the Cameron motion,
denying it without explanation or opinion yet, the HDC,
in turn, never notified either Cameron or plaintiff
[the plaintiff discovered this little nasty maneuver
when visiting the HDC in June 2015 to clear a warrant
but which turned into a blanket dismissal of all
matters otherwise open or ongoing since May 2005];

39) That in February 2009, after the plaintiff's release
from jail on a related [to the UPI] trial conviction
for disorderly conduct [verdict was vacated in July
2010 on appeal], and four (4) days into his ten-day
parole [plaintiff was previously prevented from being
paroled by the open UPI charge, itself separated from
a disorderly conduct charge that should have been
tried together but was not, for arguably nefarious
reasons], his parole officer, John Torchio, inquired

39)   (continued) of USSS Ralph Sozio, having been made
      curious by a reference to a "presidential threat"
      arrest, itself an erroneous and suspicious mis-
      characterization of plaintiff's May 2005 arrest on the
      Tevrizian charge, which later, as "background", showed
      up in Torchio's files from Hingham District Court;

40)   That the plaintiff only learned of Torchio's call to
      Ralph Sozio after speaking with HDC probation officer
      Robert Tobin in August 2010, who read from his notes;

41)   That after the otherwise undocumented contact with
      Sozio, Torchio sought to violate the plaintiff by
      alleging that the plaintiff's address was "unknown",
      even though the plaintiff had previously left new
      address information with Torchio on his voicemail;

42)   That indeed Torchio secured an arrest warrant for the
      plaintiff, violating him both for the disorderly
      conduct charge and the UPI, thus preventing any action
      on anything filed by the plaintiff with the HDC,
      including a December 2008 motion by the plaintiff to
      set aside a CWOF [Continuation Without A Finding]
      after it became apparent to the plaintiff that the UPI
      trial mishap was a complete ruse;

43) That there exists a "hidden agent" at the HDC who
is aiding the Scituate Police, Ralph Sozio, and
Stephen Pfaff, and has done so, alarmingly, on an
ongoing basis and such person, it is believed, is
likely known to AUSA Tobin if not Pfaff himself;

### Damages

1. That as a result of the his federal prosecution on the
charge of Interstate Email Threat, the plaintiff has had
to endure multiple and extensive physical, financial and
emotional costs and expenses, pain and suffering, anxiety,
apprehension, humiliation, embarrassment in newspapers,
court records, online and in social, professional and
academic circles, inconvenience, frustration, extensive
and undue travel, the inability to renew his drivers
license for many months as result of warrants outstanding,
loss of respect and reverence of his friends, family,
colleagues and peers, lost income, loss of consortium and
numerous and various opportunities lost or impaired and
other damages not as yet known, identified or accrued.

2. That as a result of the federal prosecution of plaintiff
on the subject Interstate Email Threat charge, which saw
numerous periods of extended incarceration, restrictive
pretrial conditions [home confinement, GPS monitoring and

no travel] and, as well, required his appearance at pre-
trial hearings as well as a trial, the plaintiff had to
endure delays and interruptions in the pursuit of his
graduate studies, work credentials, and other projects;

3.  That as a result of the long, ongoing, baseless and
seemingly endless prosecution of the plaintiff by and
through the acts and omissions of the defendants, which
brought about extended periods of *federal* as well as
state incarceration, the plaintiff's follicular thyroid
caner treatment saw significant delays and omissions
that could as yet bring about indeterminable future pain,
suffering, and anxiety, including long-term negative
effects of having gone 14 months, while incarcerated,
without thyroid hormone replacement, following surgery, a
situation causing hypothyroidism, itself a condition that
first, while incarcerated, caused extensive fatigue and
muscle spasms, but which has led to chronic low back pain
due to hypothyroidism-induced spinal degeneration that
exists to this very day and requiring, for the last three
years, that the plaintiff sleep on a recliner despite
months of physical therapy which, at this point, though
succeeding in part, may not ever fully remedy the pain
experienced by the plaintiff.

## **Facts Relied Upon**

Allegations herein are supported by facts and evidence contained in public court records, police reports, the sworn testimonies of Jeffrey L. Clemens and Jonathan A. Clemens, that which is obtainable under Discovery including sworn depositions, expert testimonies, the testimony and reports of past and present employees of the U.S. Secret Service, the Federal Bureau of Investigation {FBI}, the Scituate Police Department, Hingham Police Department, the Town of Scituate Board of Selectmen, including official minutes and other written documents, and others yet to be cited or yet unknown, including but not limited to those associated with the Hingham District Court, the Hingham Probation Office, Massachusetts Parole Board and Attorney General's Office, and the Manatt, Phelps, and Phillips law firm.

## **Cause of Action**

The preceding facts, provable allegations and reasonable inferences made from them constitute actionable conduct on the part of the named defendants, to be otherwise designated as Counts [1] to [5], more specifically:

1.  The acts and omissions on the part of Defendant Stephen Pfaff constitute malicious prosecution.

2.   The acts and omissions on the part of Defendant Patricia
     Vinchesi constitute malicious prosecution.

3.   The acts and omissions on the part of Defendant Jerry
     Laveroni constitute malicious prosecution.

4.   The acts and omissions on the part of Defendant Lee
     Phillips constitute malicious prosecution.

5.   The acts and omissions on the part of Defendant Ralph
     Sozio, herein named in his personal capacity, constitute
     malicious prosecution.

### Relief Sought

     The plaintiff prays for equitable relief in the form of
damages, in the amount of $800,000 compensatory, to be proven
at trial, and $2,400,000 punitive, and other relief as deemed
fair and appropriate.

### Jury Trial

     The plaintiff hereby demands a trial by jury pursuant
to Rule 38(b) of the Federal Rules of Civil Procedure.


     Respectfully submitted,

Jeffrey L. Clemens      Dated this 2nd day of October 2020